[Cite as *In re C.W.*, 2024-Ohio-4659.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

IN RE: C.W.

C.A. No. 31078

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No. DN-22-04-0346

DECISION AND JOURNAL ENTRY

Dated: September 25, 2024

STEVENSON, Presiding Judge.

{¶1} Appellant, M.W. ("Father"), appeals from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated his parental rights and placed his minor child in the permanent custody of Summit County Children Services Board ("CSB"). This Court affirms.

I.

{¶2} Father is the biological father of C.W., born August 31, 2012. The child has autism spectrum disorder and needs assistance to meet most of her basic needs. At the time this case began, C.W. was nine and a half years old, was not fully toilet trained, and was able to speak only a few words. C.W. had also suffered a significant trauma when her mother unexpectedly died in 2018. Since the mother's death, Father had been C.W.'s sole caregiver and relocated with her to Northeastern Ohio from the family home in Florida. Father grew up in Cleveland but does not have a support network of family or friends here.

{¶3} Since relocating to Ohio, Father has continually demonstrated that he does not trust others to educate or care for his child. CSB was involved with Father and C.W. on a voluntary basis during 2019 and 2021, because Father was not meeting the child's basic needs, including that he had not enrolled, or did not keep her enrolled, in school. Rather than having C.W. regularly attend school, where properly trained professionals could have addressed her extensive developmental needs, Father insisted that he could teach and care for C.W. at home. He failed to demonstrate that he had "any significant knowledge" about the child's autism diagnosis, however. Furthermore, Father did not follow any curriculum when he attempted to teach C.W. at home. He had dropped out of school after the seventh grade, had never met with any of the child's schools about her individual education plan ("IEP"), nor had he received any training about the educational needs of his child.

{¶4} CSB filed this involuntary case after Father was arrested at the Akron Metro transit station on April 4, 2022. Police were called to the scene because Father caused a loud disturbance with other Metro patrons. At the time, C.W. was with Father. Father had just purchased a bottle of liquor at a convenience store, was behaving erratically, carrying a concealed weapon, and appeared to be intoxicated. Akron Police arrested Father and charged him with multiple offenses, including carrying a concealed weapon, using weapons while intoxicated, and open container. Father was taken into custody and transported to the county jail.

{¶5} The police removed C.W. from Father's custody pursuant to Juv.R. 6 because they could not locate an appropriate adult to care for the child. The next day, CSB filed a complaint to allege that C.W. was an abused, neglected, and dependent child because of Father's arrest and incarceration and his involvement with CSB during the prior three years. In addition to Father's incarceration and pending criminal charges, CSB also learned that Father had removed C.W. from

another school and the child was not receiving appropriate intervention for her developmental delays.

{¶6} Father pulled C.W. out of her latest school because he believed that the school had not adequately met the child's hygiene needs, which caused her to develop a yeast infection. Father obtained medical attention for the child and was instructed to apply a cream to treat her yeast infection, which later resolved the problem. Nevertheless, Father continued to remain "hypervigilant" about C.W.'s vaginal hygiene and did not seem to understand that she no longer needed medical attention for the problem. Because C.W. was still wearing disposable underwear and sometimes soiled herself, the doctor had recommended that she take regular baths to keep herself clean. According to several witnesses in this case, C.W. was able to bathe herself with minimal assistance.

{¶7} At the adjudicatory hearing, Father appeared with his trial counsel. CSB agreed to dismiss the allegations of neglect and to modify some of the allegations in the complaint, and Father stipulated that C.W. was an abused (endangered) and dependent child based on the facts alleged in the complaint, as amended and attached to the adjudicatory decision. The trial court adopted the magistrate's decision, and no party filed objections.

{¶8} The trial court later placed C.W. in the temporary custody of CSB and adopted the case plan as an order of the court. Among other things, the original case plan required Father to obtain substance abuse and psychological assessments and follow all treatment recommendations, submit to regular drug testing, and sign releases of information with all case plan service providers.

{¶9} Father obtained a combined psychological and substance abuse assessment with a mental health professional at Summit Psychological Associates. The professional who evaluated Father diagnosed him with schizophrenia, antisocial personality disorder, and several substance

abuse disorders. He recommended that "any consideration for reunification" between Father and C.W. "should be contingent on" Father: (1) obtaining a psychiatric assessment and following any recommended treatment, which would presumably include psychiatric medication; (2) engaging in consistent and ongoing individual counseling; and (3) completing a parenting instruction program because he had demonstrated a lack of basic parenting knowledge. The written report explicitly required a psychiatric assessment to provide "greater diagnostic clarity and determine whether [Father] might benefit from medications to help manage his psychiatric condition."

{¶10} CSB filed an amended case plan to incorporate the recommendations of the Summit Psychological assessment. Father initially filed objections to the amended case plan because he did not agree with the diagnosis of schizophrenia. He planned to support his objections with an independent mental health assessment performed by a professional from Advanced Therapy Center. Although the trial court extended the date originally set for the objection hearing, Father began, but did not complete, the independent assessment prior to the hearing on his objections. Because Father presented no evidence to contradict the Summit Psychological assessment, the trial court adopted CSB's amended case plan.

{¶11} As would later be demonstrated on the record, however, the results of Father's independent assessment at Advanced Therapy did not differ significantly from the Summit Psychological assessment. The Advanced Therapy evaluator did "[n]ot fully" agree that Father had schizophrenia because Father did not appear to experience delusions or hallucinations. He did agree, however, that Father demonstrated some "misperceptions of reality[,]" "grandiose ideas[,]" and disjointed thinking that made communication with him difficult because Father could not stay on topic during a conversation. The Advanced Therapy professional opined that Father would need ongoing psychiatric medication management, consistent mental health counseling, and

"ongoing monitoring" to enable him to have any role "in raising, or even taking care of [his] autistic child[.]"

{¶12} Although Father engaged in some counseling, he did not meet with a medical professional or otherwise attempt to obtain a psychiatric assessment or take prescribed medication to stabilize his thoughts and behavior. CSB also remained concerned that Father did not understand the abilities or needs of his child, was reluctant to accept input from trained professionals, and insisted that he was the only one who could properly care for C.W. For example, C.W. had a yeast infection before this case began, but after the child's doctor told Father that C.W. no longer needed treatment, Father continued to be preoccupied with her vaginal hygiene. No one believed that Father's preoccupation was sexual in nature, but they were concerned that Father did not understand that the child took regular baths in the foster home or that it was inappropriate for him to assist her by applying creams to, or cleaning, the child's vaginal area.

{¶13} During a visit early in this case, on May 10, 2022, Father brought a razor with him and told the supervisor that he planned to shave the child's legs and pubic hair, apparently believing that shaving the area was necessary for the child's hygiene. The supervisor informed him that he was not permitted to shave the child, and conveyed information about the incident to the caseworker.

{¶14} Afterward, the caseworker, Father's counselor, the guardian ad litem, the child's doctor, and C.W.'s developmental disabilities support specialist discussed this issue at length with Father. They emphasized that the appropriate way to clean the child was to allow her to take a bath and that C.W. had the ability to bathe herself. They further emphasized that Father's unnecessary contact with C.W.'s vaginal area was inappropriate behavior between a male adult and a prepubescent female child and that his behavior was potentially traumatic to C.W.

{¶15} Father was repeatedly told during this case that, if he was concerned that regular bathing did not adequately address C.W.'s hygiene needs, he should consult the caseworker, guardian ad litem, or the child's doctor. Father assured them that he understood and would not try to shave C.W. For more than one year, because no one observed anything to suggest otherwise, CSB believed that the problem had been resolved.

{¶16} During January 2023, CSB assigned a new caseworker to this case. That caseworker had a "very low functioning special needs" family member. For that reason, CSB believed that she would be better able to understand the needs of C.W. and Father's role as her parent, and that Father would relate to her better than the prior caseworker. Because C.W. and Father appeared to be closely bonded, and the agency had found no suitable relatives who were willing and able to care for the child, Father's visits with C.W. were gradually expanded.

{¶17} On June 29, 2023, CSB permitted Father to have one 7-hour unsupervised visit in his home. When the caseworker transported C.W. to Father's home, she observed that C.W. was excited to see Father. The caseworker explained that C.W. was "bouncing up and down in her seat" and "humming and singing" on the way to Father's home and that she ran to see him when they arrived.

{¶18} When the caseworker came for C.W. after the visit, however, C.W. was agitated, hit Father and refused to say goodbye to him, and the child deliberately spilled her drink and threw things in the caseworker's car. The caseworker opined that C.W. "was definitely emotionally distressed" after the visit. The caseworker believed that something had happened during the visit to cause the child's distress, but C.W. was unable to communicate with her.

{¶19} Shortly afterward, Father's unsupervised visits were suspended because CSB learned from the foster mother that Father had shaved C.W.'s pubic hair during the visit. The

foster mother noticed when she gave the child a towel after C.W. had bathed herself. The caseworker contacted the guardian ad litem, Father's counselor, and many others involved in this case. Given their prior discussions with Father, they were all shocked that he still did not understand that his action had been an inappropriate response to his concerns that the child was itchy. Because of C.W.'s developmental delays and inability to protect herself, CSB and the trial court expressed additional concern that the potential trauma to the child was magnified. Father, on the other hand, did not believe that he had done anything wrong and insisted that he had the right to shave C.W. because she is his daughter.

{¶20} In hindsight, the caseworker admitted that, during the six months that she had been assigned to this case, she had advocated for reunification between Father and C.W., but that she had "turned a blind eye" to several of his parenting problems. She admitted that Father's behavior was often erratic and confrontational, and that he had always been reluctant to accept "any kind of feedback" about his ability to parent C.W. Since the amended case plan had been adopted four months earlier, Father still had not taken any steps to obtain a psychiatric assessment or treatment from a medical professional with psychiatric medication. CSB had also received minimal information about Father's progress in counseling.

{¶21} Because Father's behavioral health agency also did not maintain consistent contact with Father's probation officer, the probation officer required Father to engage in services through Community Health Center ("CHC"), an agency preferred by the probation department. Father began services at CHC but did not sign a release for CHC to provide information to CSB. CSB would later learn from Father's probation officer, however, that Father's probation was extended for an additional 10 months because Father missed many drug screens and failed to complete substance abuse treatment.

{¶22} On August 15, 2023, CSB moved for permanent custody of C.W., alleging that permanent custody was in the child's best interest and that the first prong of the test was met under R.C. 2151.414(B)(1)(d), and several alternative grounds under R.C. 2151.414(B)(1)(a) and 2151.414(E). CSB later filed an amended permanent custody motion to allege an additional first prong ground under R.C. 2151.414(E)(16). Following an evidentiary hearing, the trial court terminated Father's parental rights and placed C.W. in the permanent custody of CSB. Father appeals and raises two assignments of error.

II.

## ASSIGNMENT OF ERROR I

> THE TRIAL COURT COMMITTED REVERSIBLE AND PLAIN ERROR WHEN IT TERMINATED FATHER'S PARENTAL RIGHTS WITHOUT COMPLYING WITH THE INDIAN CHILD WELFARE ACT AT THE PERMANENT CUSTODY HEARING.

{¶23} Father's first assignment of error is that the trial court erred by terminating Father's parental rights to C.W. because "at no point before, during, or even after the hearing did the trial court ever inquire as to whether or not C.W. had any Native American ancestry" as required by the Indian Child Welfare Act ("ICWA") set forth in 25 U.S.C. Ch. 21, Subchapter I, or the related administrative regulations. Father did not raise this issue in the trial court, so he has forfeited all but plain error. *See In re T.B.*, 2014-Ohio-4040, ¶ 12 (9th Dist.). Father has failed to argue or demonstrate plain error on appeal. Although he uses the term "plain error," he does not articulate how he was prejudiced in any way.

{¶24} In fact, at the adjudicatory hearing, Father stipulated to the facts alleged in the complaint. The complaint included a request that the trial court inquire into the applicability of ICWA in this case, but the final enumerated paragraph of CSB's complaint alleged that "[CSB] does not have any reason to believe that this is an Indian Child." After Father stipulated that ICWA

was not applicable to C.W., there was no need for CSB or the trial court to have delved into the matter further. *In re D.S.*, 2024-Ohio-3175, ¶ 11 (9th Dist.). Lastly, Father points to no evidence in the record before us that establishes that the trial court knew or had reason to know the ICWA may apply to this child.

**{¶25}** Consequently, Father has failed to demonstrate any error, much less plain error, in the lack of further inquiry into ICWA at the permanent custody hearing. Father's first assignment of error is overruled. *Id.* at ¶12.

## ASSIGNMENT OF ERROR II

THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT GRANTED PERMANENT CUSTODY TO [CSB] AS THE TRIAL COURT'S DECISION WAS NOT SUPPORTED BY EVIDENCE BEYOND A REASONABLE DOUBT AND WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

**{¶26}** Father's second assignment of error is partially premised on this Court finding merit in his first assignment of error. Specifically, he maintains that, because the trial court did not rule out the applicability of ICWA to C.W., it was required to apply the heightened evidentiary standard set forth in ICWA to CSB's permanent custody motion. *See* 25 U.S.C. 1912(f). Because this Court found no merit in Father's first assignment of error, it need not address the merits of his second assigned error, insofar as it is based on his first.

**{¶27}** Next, Father makes an alternative argument under the correct legal standard for this Court to review the evidence supporting the permanent custody judgment. Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned; orphaned; has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; the child or another child of the same parent has been

adjudicated abused, neglected, or dependent three times; or that the child cannot be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D)(1). R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 98-99 (1996).

{¶28} In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal quotations and citations omitted.) *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id*. at ¶ 21.

{¶29} The trial court found that the first prong of the permanent custody test was satisfied because C.W. had been in the temporary custody of CSB for at least 12 months of a consecutive 22-month period. Father does not dispute that finding, which is supported by the record. According to R.C. 2151.414(B)(1), "a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home." C.W. was adjudicated abused and dependent on June 6, 2022. Because 60 days after the child's April 4 removal was June 3, 2022, three days earlier than the adjudication date, June 3 is the date to be used in this time calculation. The record reveals that, at the time CSB moved for permanent custody of C.W. on August 15, 2023, the child had been in its temporary custody for more than 14 months of the prior consecutive 22 months.

{¶30} Father suggests that the trial court erred by failing to make additional findings under R.C. 2151.414(E). Although CSB had alleged alternative first-prong permanent custody grounds under several subsections R.C. 2151.414(E), there was no need for the trial court to make findings under those grounds. "It is well-settled that the five R.C. 2151.414(B)(1) first-prong factors are alternative findings, and CSB need only prove one of those grounds." *In re T.B.*, 2020-Ohio-4040, ¶ 11 (9th Dist.); R.C. 2151.414(B)(1) (the trial court must find that "any of the following" enumerated factors apply.). Because the trial court's "12 of 22" finding is supported by the record, the trial court satisfied the requirement of R.C. 2151.414(B)(1) that it find one ground under the first prong of the permanent custody test.

{¶31} Next, the trial court was required to find that permanent custody was in the best interest of the child. When reviewing the trial court's best interest determination, this Court focuses primarily on the specific factors set forth in R.C. 2151.414(D). *In re M.S.*, 2023-Ohio-1558, ¶ 25 (9th Dist.). In making its best interest determination, the trial court was required to consider the statutory best interest factors, which include: the interaction and interrelationships of the child, her wishes, the custodial history of the child, her need for permanence and whether that can be achieved without a grant of permanent custody, and whether any of the factors outlined in R.C. 2151.414(E)(7)-(11) apply. R.C. 2151.414(D)(1)(a)-(e); *see In re R.G.*, 2009-Ohio-6284, ¶ 11 (9th Dist.). None of the factors set forth in R.C. 2151.414(E)(7) through (11) are relevant to this case.

{¶32} Father's interaction with C.W. during most of this case was limited to weekly visits with the child that were supervised or monitored by CSB. Everyone involved with this case agreed that Father and C.W. loved each other and were closely bonded. Concerns about their interaction focused on Father's unstable mental health and his inability to understand the evolving

developmental needs and abilities of C.W. Although C.W. is autistic and developmentally delayed, by the end of this case, she was 11 years old and had made significant progress during the previous two years. C.W. was almost fully toilet trained, was able to bathe herself, and had matured physically and emotionally, but Father continued to treat her as if she were a very young child. Moreover, he was not receptive to the suggestions of medical, developmental, mental health, children services, or other professionals about how to parent his child.

{¶33} Although Father argues on appeal that CSB's concerns about his ability to parent C.W. involved only "the one incident in June 2023," when he shaved C.W. during the unsupervised visit, the record reveals otherwise. The shaving incident was one of many behavioral symptoms of Father's untreated mental health problems. More than one year before CSB moved for permanent custody, the trial court adopted the amended case plan, which required Father to obtain a psychiatric assessment to enable him to begin treatment with medication, but he had not taken any steps to do so. The psychological professionals who evaluated Father at Summit Psychological and Advanced Therapy both testified at the hearing. They agreed that Father required psychiatric medication management to stabilize his erratic thinking and moods. Both opined that Father would be unable to make much progress in mental health counseling or parenting instruction without also engaging in ongoing psychiatric treatment.

{¶34} Explaining that Father was "not a person who can . . . think through problems[,]" the Advanced Therapy professional opined that Father would need psychiatric medication management to stabilize his thinking, and counseling with a therapist "who would be able to teach him very practical" coping skills and solutions to address problems that arise in his life. Notably, he emphasized that Father would need ongoing psychiatric medication management, consistent mental health counseling, and "ongoing monitoring" to enable him to have any role "in raising, or

in even taking care of [his] autistic child[.]" Unfortunately, Father failed to meet his case plan requirements for his mental health needs.

{¶35} It was also concerning to CSB that Father had not taken an active role in meeting with C.W.'s IEP team or other professionals who understood how to address the child's developmental delays. Given that he had failed to address his psychiatric problems, however, witnesses opined that Father would continue to be uncooperative with professionals who attempted to teach him how to care for his child. Father continued to insist that he knew how to teach and care for his child, and did not seem to recognize that she had flourished while she had been in foster care and had consistently engaged in ongoing instruction and therapy to address her developmental delays and other specific needs.

{¶36} Because C.W. was nonverbal and significantly delayed, she was unable to express her own wishes about where she wanted to live. The guardian ad litem, who had been on this case since the beginning, opined that permanent custody was in the child's best interest. He expressed concern that Father had not complied with several aspects of the case plan and continued to exercise poor judgment and make "bizarre" statements. He further testified that, at the time of the hearing, he doubted that Father was able to meet his own basic needs, let alone those of a child with significant developmental needs.

{¶37} C.W.'s custodial history had included three to four years of living in Father's sole custody before this case began. Father had not kept her enrolled in school or otherwise ensured that she was receiving the developmental intervention that she needed. During the nearly two years that this case was pending, C.W. made significant progress while consistently enrolled in school and living with foster parents who were actively involved in the child's schooling and reinforced the goals of her IEP when the child was at home. Father points to the fact that C.W.

had lived in three different foster homes during this case, implying that her life was unstable while in CSB custody, but he overlooks that C.W. disrupted from at least one of her foster homes because of Father's continual criticism about the care C.W. was receiving in that home.

{¶38} Given the evidence before the trial court, this Court cannot conclude that it lost its way by terminating Father's parental rights and placing C.W. in the permanent custody of CSB. *See Eastley* at ¶ 20. Father's second assignment of error is overruled.

### III.

{¶39} Father's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

SCOT STEVENSON
FOR THE COURT

CARR, J.
CONCURS.

FLAGG LANZINGER, J.
CONCURS IN JUDGMENT ONLY.

APPEARANCES:

SHUBHRA AGARWAL, Attorney at Law, for Appellant.

ELLIOT KOLKOVICH, Prosecuting Attorney, and MARRETT W. HANNA, Assistant Prosecuting Attorney, for Appellee.

JOSEPH KERNAN, Guardian ad Litem.